UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DIANA MCMILLEN,<br><br>          Plaintiff,<br><br>     v.<br><br>AMERICO FINANCIAL LIFE AND ANNUITY INSURANCE COMPANY, et al.,<br><br>          Defendants.<br>_____/ | Case No. 1:13-cv-1189 LJO JLT<br><br>ORDER GRANTING IN PART AND DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT<br><br>(Doc. 23) |

Now before the Court is Defendants Americo Financial Life and Annuity Insurance Company ("AFLAIC"), Americo Life, Inc. ("ALI"), and Great Southern Life Insurance Company's ("GSL's") motion for summary judgment. Plaintiff Diana McMillen ("Ms. McMillen") has filed an opposition to the motion, and Defendants have filed a reply. Upon careful consideration of the parties' submissions, the Court GRANTS IN PART and DENIES IN PART Defendants' motion for summary judgment.

I.     BACKGROUND

   A.     Factual Background

This case concerns a dispute over the payment of life insurance benefits. In June 1981, Hursey Shipley ("Mr. Shipley") purchased a life insurance policy from Commercial Bankers Life Insurance Company ("Commercial"). The policy had a face value of $50,000 and identified Ms. McMillen, who was Mr. Shipley's wife at the time, as the policy's beneficiary. The policy also contained two "Family Riders," which provided coverage for Ms. McMillen and her daughter, Krista Shipley.

1

1  Approximately two months later, Mr. Shipley died in a motorcycle accident. Commercial was
2  notified of Mr. Shipley's death and began to process Mr. Shipley's life insurance policy. However, it
3  is unclear whether Commercial completed processing the policy and whether Commercial ever paid
4  death benefits to Ms. McMillen. In a letter dated October 7, 1981, Commercial notified Fred Richman
5  ("Mr. Richman"), Mr. Shipley's agent, that Commercial initiated a routine claim investigation into the
6  matter and that Commercial hoped to reach a final determination regarding benefits within two weeks.
7  Nevertheless, there is no record of any further correspondence between Commercial and Mr. Richman,
8  nor is there any record of any dispensation of the claim.[1]

9  In 1994, Commercial changed its name to Fremont Life Insurance Company ("Fremont Life").
10 In February 1996, Fremont Life entered into a Master Agreement with ALI and GSL. As part of the
11 agreement, GSL assumed some of Fremont Life's "in force" life insurance policies. Specifically, GSL
12 assumed "all liabilities associated with all life insurance policies issued or assumed by Fremont Life in
13 force on December 31, 1995 . . . , or issued by Fremont Life to become effective on or after such date,
14 including all riders and contracts of reinsurance[.]"

15 Defendants did not discover that Mr. Shipley had passed away until sometime in October 2011.
16 Believing that they were responsible for the payment of benefits, Defendants contacted Ms. McMillen
17 and ultimately paid her $50,000 in death benefits and $3,832.53 in interest, for a total of $53,832.53.
18 Defendants calculated the amount of interest owed to Ms. McMillen by multiplying the rate of interest
19 prevailing on their deposit accounts at the time of payment (0.25%) with the amount of time that had
20 elapsed between the date of Mr. Shipley's death and the date of payment (30.66 years). The interest
21 was not compounded.

22 Ms. McMillan contested the amount of interest paid to her; she insisted that she was entitled to
23 a much higher rate of interest. Defendants offered an additional $75,000 to settle the matter, but Ms.
24 McMillan declined the offer and filed suit against Defendants for (1) breach of contract; (2) breach of
25 implied covenant of good faith and fair dealing; and (3) declaratory relief.

---

27 [1] Defendants note that while they intend to prove that Ms. McMillen did in fact receive a payment of
28 death benefits from Commercial if this case ends up proceeding to trial, this factual dispute is beyond
   the scope of their current motion. (Doc. 23 at 11 n.1.)

**B.     Procedural History**

Ms. McMillen first filed suit in Kern County Superior Court.  The action was then removed to this Court on July 30, 2013 based on diversity jurisdiction. Ms. McMillen filed an amended complaint, which is presently her operative complaint, on January 3, 2014.

On January 9, 2014, Defendants lodged counterclaims against Ms. McMillen for (1) restitution and (2) unjust enrichment.  Defendants then filed the instant motion for summary judgment on January 29, 2014.  Ms. McMillen filed an opposition to the motion on March 3, 2014, and Defendants filed a reply on March 10, 2014.

## II.    LEGAL STANDARD

Summary judgment is appropriate when the pleadings, disclosure materials, discovery, and any affidavits provided establish that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A material fact is one that may affect the outcome of the case under the applicable law.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute is genuine "if the evidence is such that a reasonable trier of fact could return a verdict in favor of the nonmoving party." Id.

The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal quotation marks omitted).  The exact nature of this responsibility, however, varies depending on whether the issue on which summary judgment is sought is one in which the movant or the nonmoving party carries the ultimate burden of proof.  See Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007); Cecala v. Newman, 532 F. Supp. 2d 1118, 1132 (D. Ariz. 2007).  If the movant will have the burden of proof at trial, it must demonstrate, with affirmative evidence, that "no reasonable trier of fact could find other than for the moving party." Soremekun, 509 F.3d at 984.  In contrast, if the nonmoving party will have the burden of proof at trial, "the movant can prevail merely by pointing out that there is an absence of evidence to support the nonmoving party's case." Id. (citing Celotex, 477 U.S. at 323).

If the movant satisfies its initial burden, the nonmoving party must go beyond the allegations in its pleadings to "show a genuine issue of material fact by presenting *affirmative evidence* from which a jury could find in [its] favor." FTC v. Stefanchik, 559 F.3d 924, 929 (9th Cir. 2009) (emphasis in the original). "[B]ald assertions or a mere scintilla of evidence" will not suffice in this regard. Id. at 929. See also Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) ("When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.") (citation omitted). "Where the record as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587 (quoting First Nat'l Bank of Arizona v. Cities Serv. Co., 391 U.S. 253, 289 (1968)).

In resolving a summary judgment motion, "the court does not make credibility determinations or weigh conflicting evidence." Soremekun, 509 F.3d at 984. That remains the province of the jury or fact finder. See Anderson, 477 U.S. at 255. Instead, "[t]he evidence of the [nonmoving party] is to be believed, and all justifiable inferences are to be drawn in [its] favor." Id. Inferences, however, are not drawn out of the air; the nonmoving party must produce a factual predicate from which the inference may reasonably be drawn. See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898 (9th Cir. 1987).

## III.   DISCUSSION

Defendants raise two arguments in their motion. First, Defendants argue that they are entitled to summary judgment on all of Ms. McMillen's claims because Defendants do not have a contractual obligation to pay Ms. McMillen anything. Second, Defendants argue, in the alternative, that they are entitled to partial summary judgment because even assuming that they do have a contractual obligation to pay Ms. McMillen benefits, they have already paid her all that she is due. The Court addresses each argument below.[2]

---

[2] The parties filed evidentiary objections, which the Court has carefully reviewed. To the extent that the Court necessarily relies on evidence that has been objected to, the objection is OVERRULED. It is not the practice of this Court to rule on evidentiary matters individually in the context of summary judgment, unless otherwise noted. See, e.g., Oyarzo v. Tuolumne Fire District, 955 F. Supp. 2d 1038, 1052 n.1 (E.D. Cal. 2013). This is particularly true when the evidentiary objections consist of general

    **A.**    **Whether Defendants Have a Contractual Obligation to Pay Ms. McMillen**

        **1.**    **GSL**

Defendants argue that GSL does not have a contractual obligation to pay Ms. McMillen since GSL never assumed control or responsibility for the portion of Mr. Shipley's life insurance policy that entitles Ms. McMillen to benefits upon Mr. Shipley's death ("the Shipley Benefit"). Defendants stress that under the Master Agreement with Fremont Life, GSL only assumed control and responsibility for life insurance policies that were *"in force" on December 31, 1995*. Defendants insist that the Shipley Benefit was not "in force" on December 31, 1995. This is because, according to Defendants, by that date Mr. Shipley had already died and a claim made on this policy.

Defendants' argument requires the Court to interpret the Master Agreement and determine the meaning of the term "in force." Under California law, the fundamental goal of contract interpretation is to give effect to the mutual intent of the parties at the time the contract was formed. Cal. Civ. Code § 1636; Am. Alternative Ins. Corp. v. Superior Court, 135 Cal. App. 4th 1239, 1245 (Ct. App. 2006). Mutual intent is determined under an objective standard. United Commer. Ins. Service v. Paymaster Corp., 962 F.2d 853, 856 (9th Cir. 1992); Cedars-Sinai Medical Center v. Shewry, 137 Cal. App. 4th 964, 980 (Ct. App. 2006). Under this standard, "[t]he parties' undisclosed intent or understanding [of the agreement] is irrelevant to contract interpretation." Cedars-Sinai Medical Center, 137 Cal. App. 4th at 980 (citation omitted). Rather, mutual intent is determined by examining a number of objective factors, including: (1) the words used in the written agreement; (2) the surrounding circumstances in which the parties negotiated or entered into the contract; (3) the object, nature, and subject matter of the contract; and (4) the subsequent conduct of the parties. Id.; Morey v. Vannucci, 64 Cal. App. 4th 904, 912 (Ct. App. 1998).

When a dispute arises over the meaning of contract language, the first question to be decided is whether the disputed language is ambiguous. See Southern Cal. Edison Co. v. Superior Court, 37 Cal. App. 4th 839, 847 (1995). Contract language is ambiguous if it is reasonably susceptible to more than one interpretation. See Benach v. County of Los Angeles, 149 Cal. App. 4th 836, 847 (Ct. App. 2007).

---

objections such as "irrelevant" or "vague." See Capital Records, LLC v. BlueBeat, Inc., 765 F. Supp. 2d 1198, 1200 n.1 (C.D. Cal. 2010).

Ambiguity can be shown through the language of the contract itself or through extrinsic evidence of the parties' intent. See Wolf v. Walt Disney Pictures & Television, 162 Cal. App. 4th 1107, 1126 (Ct. App. 2008); Southern Cal. Edison Co., 37 Cal. App. 4th at 848. Whether language is ambiguous is a question of law for the court to decide. Benach, 149 Cal. App. 4th at 847; Winet v. Price, 4 Cal. App. 4th 1159, 1165 (Ct. App. 1992).

If the court finds the language ambiguous, the court moves to the second step: interpreting the contract. See Benach, 149 Cal. App. 4th at 847; WYDA Associates v. Merner, 42 Cal. App. 4th 1702, 1710 (Ct. App. 1996). Extrinsic evidence of the contracting parties' intent is fully admissible for this purpose. Wolf, 162 Cal. App. 4th at 1126. The interpretation of the contract is a question of law if no extrinsic evidence is admitted or if the extrinsic evidence is not in conflict. Wolf, 162 Cal. App. 4th at 1126-27; WYDA Associates, 42 Cal. App. 4th at 1710. If, on the other hand, the extrinsic evidence is in conflict and interpretation turns on the credibility of the evidence, the interpretation of the contract becomes a question of fact for the fact finder to decide. Wolf, 162 Cal. App. 4th at 1127; Benach, 149 Cal. App. at 847; Morey, 64 Cal. App. 4th at 912.

Here, the term "in force" is ambiguous. The Master Agreement does not appear to define the term. Moreover, the parties present evidence suggesting that the term is "reasonably susceptible" to at least two different interpretations. Benach, 149 Cal. App. 4th at 847. For their part, Defendants offer a copy of an AFLAIC term life insurance policy.[3] Under the express terms of the policy, "in force" is defined as "not terminated." (ECF No. 33-7 at 16.) The policy then explicitly identifies the death of the insured as one of the events that will "terminate" the policy. (Id. at 19.) Notably, as Defendants point out, the policy and its definitions were approved by the Interstate Insurance Product Regulation Commission ("IIPRC"), an industry body created for the purpose of promoting uniformity within the life insurance industry. (Id. ¶¶ 7-8.)

Defendants also present two declarations as additional support for their position that the term "in force," as used in the insurance industry, does not include policies where the insured has died. The first declaration is from Gary Muller ("Mr. Muller"), Defendants' chief executive officer at the time of

---

[3] The insurance policy at issue in this case is not an AFLAIC policy. Defendants present the AFLAIC policy to demonstrate general industry custom and usage.

the Master Agreement.  The second declaration is from James Anderson ("Mr. Anderson"), Fremont Life's President at the time of the Master Agreement.  Mr. Muller and Mr. Anderson both assert that the term "in force" is used in the insurance industry to mean "policies that are active and current" and "would not include a policy such as the Shipley [Benefit]" where the insured has died and "on which a claim had been made fifteen years earlier." (ECF No. 23-4 ¶ 14; ECF No. 23-7 ¶ 12.)  Thus, according to their view, GSL did not assume responsibility for the Shipley Benefit under the terms of the Master Agreement.  (See ECF No. 23-4 ¶ 14; ECF No. 23-7 ¶ 12.)

Ms. McMillen, on the other hand, offers a declaration from her expert, Jeffrey Gutovich ("Mr. Gutovich"), who offers a competing definition of "in force."  According to Mr. Gutovich, the term "in force" is commonly used in the insurance industry to mean any policy "where insurance death benefits are payable . . . or may become payable." (ECF No. 30-4 ¶ 8.)  Mr. Gutovich asserts that a policy does not cease to be "in force" merely because the insured has passed away and an initial claim for benefits has been made; rather, a policy remains "in force" until the benefits that are due as a result of the death are paid in full.  (See id. ¶ 9.)  Thus, in Mr. Gutovich's view, because Ms. McMillian was not paid the benefits that were due to her on or before December 31, 1995, the Shipley Benefit remained "in force" as of that date.  (See id.)  Under this interpretation, GSL assumed responsibility for the Shipley Benefit under the Master Agreement.[4]

The parties' conflicting definitions of "in force" is not resolved by evidence of Fremont Life's and Defendants' conduct.  See City of Hope National Medical Center v. Genentech, Inc., 43 Cal. 4th 375, 393 (2008) ("A party's conduct occurring between execution of the contract and a dispute about the meaning of the contract's terms may reveal what the parties understood and intended those terms to mean.").  The actions of Fremont Life support Defendants' position.  Under the terms of the Master Agreement, Fremont Life was required to provide GSL a list of policies that GSL assumed under the

---

[4] Defendants argue that Mr. Gutovich is not qualified to opine on these matters and that his opinions are conclusory.  The Court disagrees.  First, Mr. Gutovich has sufficiently shown that he is qualified to testify on insurance agreements.  Mr. Gutovich asserts that he has almost 35 years of experience in the insurance industry as a result of his work in financial planning, which includes large purchases of life insurance policies.  (ECF No. 30-4 ¶ 2.)  Second, Mr. Gutovich may rely on this background to lodge opinions regarding the industry's general usage and meaning of the term "in force," just as Mr. Muller and Mr. Anderson relied on their own experience to support their opinions on the matter.  Ultimately, Defendants' challenges to Mr. Gutovich's opinions are a matter of weight, not admissibility.

agreement. (ECF No. 23-7 ¶ 16; ECF No. 23-12 at 9.) The list that Fremont Life ultimately provided to GSL did not include the Shipley Benefit. (See ECF No. 23-4 ¶ 18; ECF No. 23-13; ECF No. 23-14.) The only policies listed were the "paid-up" Family Riders for Ms. McMillen and her daughter, Krista Shipley. (See id.) This suggests that, at least in Fremont Life's view, the Shipley Benefit was not "in force" at the time of the Master Agreement; instead, only the severable Family Riders, which became "paid-up" upon the death of Mr. Shipley, were "in force" and subject to the Master Agreement. (See id.; ECF No. 33-7 ¶¶ 13-14.)

It is Defendants' own conduct, however, that undermines their position. It is undisputed that Defendants became aware sometime in 2011 that Mr. Shipley died in 1981. Despite this knowledge – that Mr. Shipley passed away over fourteen years before GSL and Fremont Life agreed to the Master Agreement – GSL concluded after conducting an initial investigation that Ms. McMillen was entitled to death benefits and attempted to pay Ms. McMillen those benefits. Defendants try to discount this as a simple mistake on their part. However, when viewing in the light most favorable to Ms. McMillen, Defendants' conduct suggests that GSL understood the Master Agreement and the term "in force" in the same way as Mr. Gutovich and Ms. McMillen do: because an insurance policy remains "in force" until benefits are paid in full, GSL assumed responsibility for the Shipley Benefits under the terms of the Master Agreement.

In sum, there is evidence supporting each side's interpretation of the term "in force." Favoring Defendants are (1) the IIPRC approved AFLAIC insurance policy; (2) the testimony of Mr. Muller; (3) the declaration of Mr. Anderson; and (4) Fremont Life's conduct. Favoring Ms. McMillen are (1) the declaration of Mr. Gutovich; and (2) Defendants' own conduct. To resolve this dispute, the otherwise conflicting evidence must be weighed and credibility determinations must be drawn. This task cannot be completed on summary judgment. See Wolf, 162 Cal. App. 4th at 1127; Benach, 149 Cal. App. at 847; Morey, 64 Cal. App. 4th at 912. Accordingly, Defendants are not entitled to summary judgment on this issue.[5]

---

[5] Defendants argue in their reply brief that Ms. McMillen lacks *standing* to interpret or challenge the Master Agreement. Despite Defendants' contention to the contrary, this issue was not fairly raised by Defendants in their initial motion for summary judgment. The thrust of Defendants' initial motion for

8

### 2. AFLAIC and AFI

Defendants argue that AFLAIC and AFI do not have a contractual obligation to Ms. McMillen because under the terms of the Master Agreement *GSL*, not AFLAIC or AFI, acquired the disputed life insurance policy from Fremont Life. Therefore, in Defendants' view, even if Ms. McMillen is entitled to death benefits under the policy, she may only recover from GSL.

Ms. McMillen responds by arguing that Defendants are equitably estopped from denying the existence of a contractual relationship between herself, AFLAIC, and AFI. Ms. McMillen asserts that AFLAIC and AFI communicated with her as if they were the parties who were ultimately responsible for paying the Shipley Benefit. (See ECF No. 30-3 ¶ 12.) Ms. McMillen points to the correspondence between Defendants and herself regarding the matter, all of which were made on AFLAIC and AFI's letterhead.[6] (See ECF No. 30-6 at 6-16.)

"The doctrine of equitable estoppel is founded on concepts of equity and fair dealing." City of Goleta v. Superior Court, 40 Cal. 4th 270, 279 (2006). The doctrine "provides that a person may not deny the existence of a state of facts if he intentionally led another to believe a particular circumstance to be true and rely upon such belief to his detriment." Strong v. County of Santa Cruz, 15 Cal. 3d 720, 725 (1975). The elements of equitable estoppel are "(1) the party to be estopped must be apprised of the facts; (2) he must intend that his conduct shall be acted upon, or must so act that the party asserting the estoppel has a right to believe it was so intended; (3) the other party must be ignorant of the true state of the facts; and (4) he must rely upon the conduct to his injury." Id. (citation omitted). See also City of Hollister v. Monterey Ins. Co., 165 Cal. App. 4th 455, 488 (Ct. App. 2008) (indicating that the

---

summary judgment was contract interpretation. There was no apparent reference to the more specific issue of standing. Accordingly, the Court will not address the merits of this issue since Ms. McMillen was not afforded a fair opportunity to respond. Accord Zamani v. Carnes, 491 F.3d 990, 997 (9th Cir. 2007) ("[A] district court need not consider arguments raised for the first time in a reply brief."). To the extent that Defendants believe they have a colorable argument regarding standing, they are free to raise and fully address this issue in a future motion. The deadline for dispositive motions in this case is not set to expire until August 5, 2014.

[6] Ms. McMillen also notes in her statement of undisputed facts that GSL is the subsidiary of AFLAIC and AFI. Ms. McMillen, however, does not make any argument in her brief that the corporate veil should be pierced and that AFLAIC and AFI are liable based upon this parent-subsidiary relationship. See United States v. Bestfoods, 524 U.S. 51, 61 (1998) ("It is a general principle of corporate law . . . that a parent corporation . . . is not liable for the acts of its subsidiaries.") (citations omitted). As such, the Court does not reach this issue. The Court only reaches the issue of equitable estoppel.

1  elements of equitable estoppel are (1) the party to be estopped has engaged in inequitable conduct; (2) the conduct caused or induced the other party to suffer disadvantage; and (3) equitable considerations warrant the conclusion that the first party should not be permitted to exploit the disadvantage that he inflicted on the second party).

Ms. McMillen fails to establish the last element of equitable estoppel: she fails to establish that she will be injured if AFLAIC and AFI are allowed to deny the existence of a contractual relationship between them and her. To be sure, Ms. McMillen has spent "substantial time and resources" asserting her claims against AFLAIC and AFI in this case and with the Department of Insurance. (ECF No. 30 at 11.) But this fact alone does not mean that AFLAIC and AFI should remain defendants in this case if there is no other basis for imposing liability on them. This is especially true since there is nothing to suggest that Ms. McMillen cannot or will not be made whole by GSL, the otherwise proper defendant to Ms. McMillen's claims, should she prevail in this case.

In the absence of a contractual relationship between AFLAIC, AFI, and Ms. McMillen, Ms. McMillen's claims against AFLAIC and AFI for breach of contract, breach of the implied covenant of good faith and fair dealing, and declaratory relief fail. See CDF Firefighters v. Maldonado, 158 Cal. App. 4th 1226, 1239 (Ct. App. 2008) (stating that the existence of a contract is an element of a breach of contract claim); see also Smith v. City and County of San Francisco, 225 Cal. App. 3d 38, 49 (Ct. App. 1990) (stating that the prerequisite for any claim for breach of the implied covenant of good faith and fair dealing is a contractual relationship between the parties). Accordingly, AFLAIC and AFI are entitled to summary judgment.[7]

**B.     Whether Ms. McMillen is Entitled to More Than What GSL Paid**

Defendants argue that Ms. McMillen has been paid $50,000 in death benefits and $3,832.50 in interest, and therefore has already been paid in full. Ms. McMillen counters that the interest payment was too low. Ms. McMillen contends that GSL calculated the amount of interest due using the interest rate prevailing *at the time of payment* (which in 2012 was 0.25%) when, in actuality, GSL should have

---

[7] Furthermore, the Court will enter judgment in AFLAIC's and AFI's favor pursuant to Federal Rule of Civil Procedure 54(b). There is no just reason to delay entering such judgment given the fact that (1) no claims remain against AFLAIC or AFI; and (2) Ms. McMillen's basis for imposing liability on AFLAIC and AFI is clear and distinct from the claims remaining in this case.

calculated the amount of interest due by using the interest rate prevailing *at the time of Mr. Shipley's death* (which was anywhere from 7-15%).

The parties disagreement stems from California Insurance Code section 10172.5(a), which sets forth the interest an insurer must pay if it does not pay death benefits owed to a beneficiary within 30 days of the death of the insured. It provides, in relevant part:

> [E]ach insurer . . . that fails or refuses to pay the proceeds of, or payments under, any policy of life insurance issued by it within 30 days after the date of death of the insured shall pay interest, at a rate not less than the then current rate of interest on death proceeds left on deposit with the insurer computed from the date of the insured's death, on any moneys payable and unpaid after the expiration of the 30-day period.

Cal. Ins. Code § 10172.5(a). The parties read this provision differently and, consequently, argue that section 10172.5(a) requires different rates of interest. Because there is no case law on this matter, the Court's task here is to construe this language and give it its proper effect.

### 1.    Rules of Statutory Construction

When a federal court interprets a California statute, California's rules of statutory construction and interpretation apply. See Harvey's Wagon Wheel, Inc. v. Van Blitter, 959 F.2d 153, 154 (9th Cir. 1992). Under California law, the touchstone of statutory construction is ascertaining the legislature's intent in order to effectuate the law's purpose. People v. Arias, 45 Cal. 4th 169, 177 (2008). The court begins by looking at the statute's words and giving them their usual and ordinary meaning. Goodman v. Lozano, 47 Cal. 4th 1327, 1332 (2010). The statute's text and plain meaning control unless they are ambiguous or their literal meaning conflicts with the statute's evident purpose. See id.; Arias, 45 Cal. 4th at 177. If the statute is ambiguous, the court may turn to extrinsic aids, such as legislative history, the statute's purpose, and public policy. Arias, 45 Cal. 4th at 177.

### 2.    The Statute's Text

As indicated above, the relevant language in section 10172.5(a) provides:

> [E]ach insurer . . . that fails or refuses to pay the proceeds of, or payments under, any policy of life insurance issued by it within 30 days after the date of death of the insured shall pay interest, at a rate not less than the *then current* rate of interest on death proceeds left on deposit with the insurer computed from the date of the insured's death, on any moneys payable and unpaid after the expiration of the 30-day period.

Cal. Ins. Code § 10172.5(a) (emphasis added). The parties' dispute concerns the import of the phrase "then current" in the sentence. The Merriam-Webster Dictionary defines "then" as "at that time" and

11

1 "currently" as "existing in the present time." Therefore, the phrase "then current" means "at that time existing in the present time." The difficultly is determining which time or event is being referenced by the phrase. The statute's text suggests as many as three possibilities.

First, as Defendants argue, it could refer to the date when an insurer makes an interest payment pursuant to section 10172.5(a). This reading has some grammatical appeal since the verb clause "shall pay" immediately precedes the phrase "then current." It would be reasonable to expect the subject of a phrase to precede it. In this way, section 10172.5(a) would be read in logical progression: the opening clause constitutes the triggering language, which is followed by the rate of interest, an amount of time, and then the principal. The only drawback of this reading is that it renders the word "then" somewhat superfluous since the sentence could accomplish the same meaning by omitting the word "then." And in general, a construction that renders words "surplusage" should be avoided when possible. People v. Black, 32 Cal. 3d 1, 5 (1982).

Second, as Ms. McMillen argues, it could refer to the date of the insured's death. This reading has the advantage of giving effect to every word in section 10172.5(a). But this reading also depends heavily on the phrase "computed from the date of the insured's death," which notably comes *after* the phrase "then current." Again, one would expect the subject of a phrase to *precede* it, not follow it. It seems more likely that the phrase "computed from the date of the insured's death" simply denotes the date when interest begins to accrue (i.e., the time component of the interest calculation), as opposed to specifying the rate of interest.

Third, the phrase "then current" could refer to no specific date at all. Rather, the phrase might simply underscore the fact that an insurer is required to pay interest at the same rate it pays other death proceeds that are left on deposit with the insurer. Under this reading, the interest rate to be paid under section 10172.5(a) would not be fixed. Instead, it would fluctuate and average whatever interest rates were paid by the insurer on other proceeds left on deposit during that time period. The drawback of this reading, however, is that it renders the entire phrase "then current" somewhat redundant.

### 3. Statutory Context

Because the text of section 10172.5(a) is ambiguous, the Court turns to other provisions in the statute for clarity and guidance. Section 10172.5(a) is specifically referenced in California Insurance

Code section 10172.5(c). Section 10172.5(c) requires an insurer to give a beneficiary notice that the insurer will pay interest pursuant to section 10172.5(a) if death benefits were not paid in full within 30 days of the insured's death. Section 10172.5(c) also requires the insurer to specify the rate of interest that will be paid:

> In any case in which interest on the proceeds of, or payments under, any policy of life insurance . . . becomes payable pursuant to [section 10172.5(a)], the insurer shall notify the named beneficiary or beneficiaries at their last known address that interest will be paid on the proceeds of, or payments under, that policy from the date of death of the named insured. That notice shall specify the rate of interest to be paid.

Cal. Ins. Code § 10172.5(c).

Notably, section 10172.5(c) envisions notice being given *in advance* of any interest payment. The section uses the phrases "will be paid" and "to be paid," which suggest that payment has not yet occurred and will not occur until sometime in the future. This creates some tension with Defendants' reading of section 10172.5(a), as well as the "fluctuating interest rate" theory. Under those scenarios, it would be difficult for an insurer to specify the rate of interest to be paid to a beneficiary, as required by section 10172.5(c), since under those scenarios the interest rate would ultimately be determined by events that have yet to occur and will not occur until *after* notice is given. In contrast, advance notice would be practical if the phrase "then current" in section 10172.5(a) is construed to reference an event that has already occurred, such as the date of the insured's death. Therefore, while not dispositive, the language of section 10172.5(c) lends support to Ms. McMillen's interpretation of section 10172.5(a). See Arias, 45 Cal. 4th at 177 (stating that courts should adopt the construction that best harmonizes the statute internally and with other statutes).

### 4. Legislative History and Purpose

Defendants contend that legislative history supports their reading of section 10172.5(a).[8] They specifically point to an earlier proposed version of the section that fixed the rate of interest at 7 percent per annum. (See ECF No. 23-21 at 13.) The fixed rate was omitted in favor of the current language in section 10172.5(a), apparently after industry executives complained that the 7% rate was too high and

---

[8] The Court GRANTS Defendants' request for judicial notice of the statute's legislative history. See, e.g., Chaker v. Crogan, 428 F.3d 1215, 1223 n.6 (9th Cir. 2005) (taking judicial notice of a California statute's legislative history).

1  might encourage beneficiaries to delay filing their claims in order to reap what could be above-market
2  interest rates.  (See id. at 13-18.)  Defendants contend that construing section 10172.5(a) in accordance
3  with Ms. McMillen's reading creates a similar incentive structure for beneficiaries, a scenario that the
4  legislature explicitly attempted to avoid.

5  Defendants' argument is unpersuasive.  Defendants' construction of section 10172.5(a) suffers
6  the same flaw that Defendants accuse Ms. McMillen's construction of suffering.  In this case, the date
7  of death occurred during a time of high interest rates and the date of payment took place during a time
8  of low interest rates.  However, if these circumstances were switched (i.e., low interest rate at the time
9  of death and high interest rate at the time of payment), Defendant's construction of section 10172.5(a)
10 would create an incentive for beneficiaries to delay their claims and wait for higher interest rates.  This
11 is the exact same incentive structure that Defendants now protest.

12 If anything, Defendants' argument lends persuasive support to the "fluctuating interest rate"
13 theory.  Section 10172.5(a) strives to solve two problems: (1) the fact that inflation erodes the value of
14 death benefits when there is a delay in payment; and (2) the fact that insurers reap a windfall if there is
15 a delay in payment.  (See ECF No. 23-21 at 10.)  Section 10172.5(a)'s solution is to impose interest on
16 insurers in order to motivate them to complete the settlement process sooner.  (Id.)  Arguably, the most
17 effective and fairest way to achieve this would be to impose an interest rate that fluctuates and follows
18 the interest rate paid to the insurer's other depositors.  This would minimize any incentive for *both* the
19 insurer and the beneficiary to delay settlement of benefit claims.  Notably, comments in the legislative
20 history appear to support this approach.  (See ECF No. 23-21 at 10) ("AB 709 solves the problem of
21 the unsettled death benefit claim by requiring each insurer to pay interest from date of death *at the*
22 *same rate of interest it pays on deposits left voluntarily with it* (presently that figure exceeds 6% in the
23 case of many insurers) . . . .") (emphasis added).

24 **5.    Conclusion**

25 Of the three interpretations identified above, Defendants' construction is the least persuasive.
26 It would render the word "then" superfluous, would create tension with section 10172.5(c), and would
27 not aid or advance the legislative intent or purpose of the statute any more than Ms. McMillen's more
28 harmonious interpretation of section 10172.5(a) would.  The closer question is whether, starting from

the date of the insured's death, section 10172.5(a) provides for a *fixed* rate of interest (Ms. McMillen's reading) or a *fluctuating* rate of interest.  The Court need not reach this question at this time, however, as the parties have not briefed this matter and it is sufficient to say for the purposes of this motion that Defendants' argument fails.  Accordingly, Defendants are not entitled to partial summary judgment on this matter.

## IV.  CONCLUSION

For the reasons set forth above, the Court:

1. GRANTS summary judgment in favor of AFLAIC and AFI;
2. DIRECTS the Clerk of the Court to enter judgment against Ms. McMillen and in favor of AFLAIC and AFI pursuant to Rule 54(b); and
3. DENIES GSL summary judgment.

IT IS SO ORDERED.

Dated:   **March 25, 2014**          /s/ Lawrence J. O'Neill
                                     UNITED STATES DISTRICT JUDGE